## BOB COMPTON V. THE STATE.

No. 22950. Delivered November 29, 1944.
Rehearing Denied January 17, 1945.

54

The opinion states the case.

*D. J. Brookreson,* of *Benjamin,* and *Scarborough, Yates & Scarborough,* of Abilene, for appellant.

*Ernest S. Goens,* State's Attorney, of Austin, for the State.

BEAUCHAMP, Judge.

The appellant was given a sentence of two years in the penitentiary for the theft of six head of cattle from the T. W. Lee Ranch in Shackelford County in October, 1938. The case was transferred to Throckmorton County and then to Jones County, from which this appeal comes. A former conviction was reversed by this court. (135 S. W. (2d) 712).

The State relies for conviction on circumstantial evidence and a review of the facts will be necessary to determine the sufficiency of the circumstances proven by the State to support the conviction. Like many such cases the circumstances are quite involved and our conclusion is reached with no little dif-

ficulty. We are convinced, however, that they are sufficient viewed from the State's standpoint to support the verdict.

The facts are conclusive that six head of cattle were driven from the Lee Ranch across several ranches and into pastures owned and leased by Mrs. Compton, the mother of appellant, where they were found and identified as the property of Lee. Two horses had accompanied the cattle and their tracks were identical with tracks made by two horses belonging to Mrs. Compton and used on her ranch. The cattle were found on a Tuesday afternoon, having been last seen on the Lee Ranch the previous Saturday. Their brands had been changed so as to make brands similar to that used by Mrs. Compton. In the branding place on the Compton Ranch there were signs of recent activity in the branding of cattle at the time the officers examined the place on Tuesday. Further evidence without dispute by the defense will be noted in the following analysis of the testimony given by State witnesses:

Mr. Ellerd was in charge of the Lee Ranch. He identified the cattle on the Compton Ranch. He describes with accuracy the old brands on the cattle and the changes which had been made causing them to resemble Mrs. Compton's brand though not in the same place.

J. C. Woolfolk, a Deputy Sheriff of Shackleford County, testified that he went to the Compton Ranch on Monday or Tuesday. He saw where cattle had gone over the fences and describes the place of entry into each of the ranches above mentioned. The wires were torn loose from the posts and dropped to the ground. He saw fresh tracks of six or seven head of cattle and two horses. He was joined in this investigation by other officers who gave like evidence in the case. Some fences had gates through which the cattle passed. At a point within the third enclosure in the Compton Ranch and north of the house he found a large calf belonging to Lee which it was said had been driven until it had given out and lay down in some brush. He reported this to Sheriff Holland, who was at the Ibex Store nearby, and then returned to the calf where he left the tracks of the cattle and rode across the field south towards the Compton ranch house. On the way he met Bob Compton riding in a trot across the field towards the calf. When they met Compton turned around and accompanied him back to the house. This is the first involvement of Bob Compton personally. His action at this time appears to be relied upon as important. He rode around the house on the opposite side from where the witness had stopped to talk with a man. He went to the barn and then rode off in

an easterly direction, without making an explanation of his reason for doing so. A distance away he was seen to turn south or southwest. After being away fifteen or twenty minutes he returned to the barn in a trot and his horse was winded and sweaty. Other officers had arrived at the house by this time. This was approximately one o'clock in the afternoon. Some time later a party was organized and sent in search for cattle, which they found in the enclosure west of the one in which the house is situated. They found a fence partly cut, through which cattle had been recently driven into the west pasture referred to as the sheep pasture. From this enclosure they drove several head of cattle to the barn and placed them in the lot. Among them were five head of the Lee cattle on which the brands had been changed. Bob Compton was arrested and placed in jail. Soon thereafter Mrs. Compton, her daughter and Bob's twin brother Tom, were also arrested and placed in jail.

It may be remarked in a summary of all the evidence that some old oil wells, in the fields through which the cattle had travelled, created salt pits where the ground was dry and hard and free of vegetation. In crossing such places the cattle and horses made clear cut tracks. Two of the horses from the Compton Ranch were taken to such a place and caused to make tracks and this furnished evidence of the similarity of their tracks with those which had apparently accompanied the cattle. The number of cattle crossing these places corresponded with the number of Lee cattle found on the Compton Ranch.

Elmer Smith worked for the Comptons and he testified that he arrived at the ranch house early in the morning of October third, the day the officers located the cattle, and saw Bob Compton leave soon after sun-up. The only people living at the Compton place were Mrs. Compton, her daughter, who was an invalid, and the twin sons, Bob and Tom. Mrs. Compton was a large woman, not in good health, and he had never seen her ride horseback. Bob Compton directed the work about the place which Smith was engaged in doing and his twin brother, Tom, attended school. The witness said "When I saw them working cattle there, Bob is the one who gave instructions to the other men there working. Mrs. Compton was not around giving any instructions, that I know of." * * * * * While Tom was in school, Bob looked after the stock and worked on the ranch." From the first of March, when there was a division of cattle belonging to the estate of a deceased brother of appellant, until the third of October the witness said "I never heard any man other than Bob Compton, give any orders about the cattle." On cross examination Smith testified further: "From a busi-

ness standpoint, sometimes she (Mrs. Compton) would ask me to build things, and sometimes Bob would tell me to build things around the place." This statement is relied upon by appellant for the argument that he was not in charge of the property and had no more to do with its operation than others about the premises including men who were hired at various times. An analysis of the language would hardly support the argument, especially in view of other statements.

Arthur Fite, who married a sister of appellant, testifying in behalf of the State, said that on the third of October, while investigation was in progress, and at a time we are not quite able to relate to other evidence, he and one Smith came down to the south east corner of the horse pasture, south of the Compton house, and were looking for tracks near a gate that opened out into the public road. Bob Compton came towards them driving about six head of cattle while other cattle were approaching from a slightly different direction. When Bob saw the witness and Smith he turned the cattle back and went in a northwesterly direction disappearing from their sight. The witness identified a bull yearling in the herd as being one of the Lee cattle pointed out to him later. This took place about half an hour after Bob had questioned the witness concerning the purpose of some men on or near the premises, at which time he asked Fite if they were looking for cattle. The testimony of this witness does not appear to be of the most commendable type but his credibility was passed upon by the jury. In the brief filed in this cause appellant quotes at length from the testimony of Fite and earnestly insists that appellant should not be sent to the penitentiary on the testimony of Fite. If it were within the province of this court to pass on the credibility of witnesses the question presented might have quite a different consideration. In the state of the record it is not within our power to set this testimony aside and neither do we think that it is the most important evidence in the case. In all probability the jury would have returned the same verdict without Fite's testimony that they did with it. Considered in its strongest light it has but little to do with establishing the issue of guilt.

Without further analysis of the evidence, with its cumbersome details, it was a reasonable conclusion on the part of the jury that Bob Compton alone busied himself in trying to put the stolen cattle where they would not be found by the officers making the investigation and probably to drive them out of the gate into the public road and off of the premises. His act in doing so was reasonably to be interpreted as asserting possession of them. It supports the conclusion that he was then in

possession of the stolen property.

In defense of the State's case the Mother testified that she was Bob's guardian; that he owned no cattle while his brother, Tom, did; that Bob merely worked for her while Tom went to school; that he did not leave the premises during the night the cattle were supposed to have been taken. Tom's testimony was to like effect. Mrs. Compton also testified that she had leased grazing rights to one Art Taylor who had asked permission to use her brand on his cattle, explaining that he wanted to avoid trouble with his creditors. This evidence was denied by Taylor who said that he owned no cattle and had never leased any grazing rights from Mrs. Compton or used her brand. He denied any connection with the theft of the cattle.

It is noticeable that on cross examination Mrs. Compton was unable always to demonstrate a detailed knowledge of the things that had taken place on her ranch and this was relied upon by the State for its contention that Bob Compton did, to some extent, have the control and management of the premises.

Appellant relies on Prather v. State 81 S. W. (2d) 528 and Price v. State 125 S. W. (2d) 574 as authority for the contention that the evidence in the instant case is insufficient to support the jury's verdict. In the Prather case the victim of robbery by the use of violence did not see the party who assaulted him and took his watch, pipe, and pouch of smoking tobacco. There is no circumstance to connect Prather with the robbery save and except the fact that the watch and a black jack (an instrument capable of inflicting the injury on Phillips) were found in the room of the accused. A woman was also occupying the same room and a brother of appellant occupied other rooms in the same house. There is no evidence in that case that Prather asserted any right of property in the article found. He made no claim to it and took no action either to possess it or to put in out of his room. There was no denial of claim of ownership from others who might have placed it there. From the authorities discussed in the opinion it is reasonable to conclude that the case was reversed on the theory that there were other parties to whom the stolen property was at least available and who made no denial of claim of ownership of it. In the instant case all parties shown to have a right to cattle on the Compton ranch denied any connection with the stolen cattle. The appellant did not testify in his own behalf and there is no one, not even the mother, who was in position to say that he had not stolen the cattle. In the Prather case the questionable "possession" was the only circumstance of guilt while in the case be-

fore us the manner of the theft of the cattle by driving them into the Compton ranch at a time when no other persons were shown to be present and having access to the Compton horses, the suspicious conduct of appellant while the matter was being investigated including what the jury might reasonably have interpreted to be an effort to hide the cattle from the investigating officers or to exclude them from the ranch so as to relieve himself of the possession of them, are all circumstances in addition to the bare fact of possession. It has much the same effect as flight in the way of expressing a consciousness of guilt.

In the Price case a bull yearling had been taken from the pasture of one Taylor and placed in one belonging to Coffee, a brother-in-law of the appellant. A man was seen in the pasture attempting to drive the Taylor yearling together with one belonging to Coffee. When the man saw officers he disappeared in some brush. Two of the officers were positive in identifying Price, as the man. Price had offered to sell a Hereford bull in the town of Brownwood and told a witness that Coffee had raised the bull and that it was in his pasture where it could be seen. The appellant testified denying the theft and denying that he was in the pasture at the time stated by the officers. He also proved an alibi. Coffee testified that his bull was for sale. This is the evidence held to be insufficient in that case and we are unable to see in it support for appellant's contention in the case at bar.

Lee's cattle had been branded by their new possessor and this is an assertion of a property right. Neither Mrs. Compton, though the owner of the place, nor her invalid daughter are under suspicion as having done the branding. The circumstances point to appellant as one involved and are undenied by either direct or circumstantial evidence. We think it might be said that the circumstances of this case unerringly point to the fact that at the time the cattle were found in the Compton pasture the appellant had knowledge that they were stolen, indicating his connection with the original taking, and his assertion of a property right in them. The evidence is sufficient to show his possession of the cattle so soon after they were taken and his possession is unexplained, thus fulfilling the requirements of the law.

The judgment of the trial court is affirmed.

ON MOTION FOR REHEARING.

GRAVES, Judge.

Appellant contends in his motion that the testimony herein is insufficient to exclude every other reasonable hypothesis than that of appellant's guilt. We have again read the testimony carefully and come to the following conclusion:

It seems to be proven that appellant was in charge of his mother's pasture and the cattle thereon; that his mother knew practically nothing as to the affairs of the ranch nor as to its management; she seemed to have turned all of such business over to appellant, who, regardless of his age, was a skillful and capable cattleman. That at the time alleged in the indictment some one had stolen six head of Mr. Lee's cattle; that these cattle had been driven for some distance by some persons on two horses belonging to the ranch of appellant's mother over which he had control. That on the day these cattle were found on appellant's mother's ranch appellant was busying himself trying to find out what caused the presence of certain people on the ranch, and wanted to know if they were hunting cattle. Soon afterwards appellant was seen driving six head of cattle on this ranch at an unusual rate of speed, and one of these cattle, a certain bull calf, was afterwards identified and proven to be one of the stolen cattle. Upon being seen by others towards whom appellant was driving these cattle, without slackening their speed, he turned them back in the direction from which they had come. The cattle identified as the ones being stolen, had their brands blotched and changed, which changing bore evidence of having been recently and clumsily done, leaving a portion of the brand as an old one and a portion as having been recently placed thereon; branding irons, evidencing recent use, were also found on the premises. From these circumstances, as well as others, it can be seen that appellant was shown to have been in the exclusive and unexplained possession of recently stolen property, and we have held in many instances that such possession was sufficient upon which there could be predicated a verdict of guilt. See Branch's P. C., p. 1332-3, Sec. 2463, et seq., and especially is this true where there are other circumstances which, taken in connection therewith, point to appellant's guilt, such as the conduct of appellant relative to the bull calf, later identified as one of the stolen cattle, and appellant's peculiar movements while this ranch was being searched by officers and others. It is suggested by appellant that such efforts might be construed to have been an effort to get these stolen animals off the Compton ranch and throw them out in the near by lane; instead of such actions being looked upon as an evidence of guilt, such might have been utilized by the jury as showing lack of guilt, and an effort to relieve oneself of the burden of possession of such property. To this our only answer

is the jury had no evidence of any kind which they might have used in order to relieve appellant of the circumstance of such possession.

We have been taken to task relative to a statement in the original opinion wherein he said: "The appellant did not testify in his own behalf and there is no one, not even the mother, who was in position to say that he had not stolen the cattle." This is claimed by appellant to demand that appellant prove his innocence rather than that the State prove his guilt. Appellant to some extent misconstrues the above statement into not only a comment on the defendant's failure to testify, but also seems to think that such failure is utilized by this court as a circumstance of guilt. It is the established law that the exclusive and *unexplained* possession of recently stolen property is a strong circumstance evidencing guilt, see Branch's P. C., supra, and this court does find appellant in such a position before this jury. His failure to take the witness stand, of course, is apparent from the record; his opportunity to explain such possession, if such possession there was, and same was evident from the record, began when the recently stolen cattle were found in a pasture over which the jury thought he had control, and the casual mention of his failure to testify was made only for the purpose of showing his continued failure at a last opportunity to explain this possession. Art. 710, C. C. P. does not prohibit the court from alluding to a defendant's failure to testify, otherwise the court would be powerless to instruct the jury to observe such statute; it does, however, prohibit such failure being taken as a circumstance against him, and we have not done so in this instance.

We think the testimony to be sufficient to support the verdict of the jury, and the motion will therefore be overruled.